# **EXHIBIT A**

VOLUME: I

PAGES: 295

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

DOCKET NO. 10-CV-155-SM

* * * * * * * * * * * * * * *

| | |
|---|---|
| ALVIN B. GALUTEN, MD, PSC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| MEDICUS RADIOLOGY STAFFING, LLC, | : |
| | : |
| Defendant. | : |

* * * * * * * * * * * * * * *

DEPOSITION OF ALVIN B. GALUTEN, MD

This deposition was taken at the offices of Sheehan Phinney Bass + Green, PA, 1000 Elm Street, Manchester, NH 03101, on Wednesday, March 23, 2011, by and before Deanna J. Dean, New Hampshire License No. 87, commencing at 10:15 a.m.

**Page 170**

1 his cell number and his phone number, for me. His
2 home number as well.
3    Q.   Okay. In case you needed him?
4    A.   In case I wanted to speak to him.
5    Q.   Okay. Do you remember anything more
6 about it?
7    A.   No, sir.
8    Q.   Do you remember anything about your
9 conversations with the other locums relative to your
10 departure?
11    A.   Other than I was taking some time off
12 because of my back, I do not remember anything
13 specific.
14    Q.   Okay. Help me to understand how this
15 works. I have a general understanding of how locums
16 work. Okay? But it's not a very thorough
17 understanding.
18       You show up at the hospital on April 30;
19 right? Somebody greets you and shows you to an
20 office; is that right?
21    A.   In particular at Hardin or in general?
22    Q.   Let's say at Hardin.
23    A.   They had a first day orientation for the

**Page 171**

1 new -- newbies.
2    Q.   Okay. And who conducted the
3 orientation?
4    A.   I believe employees from Hardin.
5    Q.   Okay. Was Mr. Welch involved in that?
6    A.   I don't remember. It was more than one
7 person, though.
8    Q.   Did you have an office there?
9    A.   They did the orientation in a room. I
10 mean, a room with a bunch of us.
11    Q.   But did you have an office at Hardin?
12    A.   I sat in the same room, same office
13 every day.
14    Q.   Okay. So they gave you --
15    A.   But it didn't have my name on it. But,
16 yes.
17    Q.   But it was an office that you used
18 during that period of time, the three-week period of
19 time?
20    A.   Yes.
21    Q.   All right. And did anybody else use it
22 during that period of time?
23    A.   Not that I'm aware of.

**Page 172**

1    Q.   Okay. And when you showed up on
2 April 30, you were staying at a hotel; right?
3    A.   Yes, sir.
4    Q.   Okay. And was that a Super 8 hotel or
5 do I have that wrong?
6    A.   I think it was a Holiday Inn. I think.
7    Q.   And how far away from the hospital was
8 the hotel?
9    A.   I would guess between three and four
10 miles.
11    Q.   All right. And how is it that you found
12 your way from Tennessee to the hotel?
13       And I don't mean how you navigated the
14 directions. I mean, did you drive a car? Did you --
15    A.   I drove a vehicle.
16    Q.   All right. Was it your own personal
17 car?
18    A.   It was a car, yes, sir. A car owned by
19 my corporation.
20    Q.   Okay. We didn't talk too much about
21 that.
22       When did you set up your corporation?
23    A.   The year would be around -- I would

**Page 173**

1 guess around 1990.
2    Q.   What was the purpose of setting up the
3 corporation?
4    A.   Well, it's where all the income for the
5 business practice went through, as well as it was
6 responsible for taking care of all the payments for
7 malpractice insurance for all the radiologists, et
8 cetera, et cetera. So all the business accounts were
9 with the corporation.
10    Q.   Okay. What kind of a car did the
11 corporation own that you used to go to the hospital?
12    A.   A Lincoln.
13    Q.   Okay. What year was it?
14    A.   Maybe '99.
15    Q.   All right. And it broke down, did it?
16    A.   It did.
17    Q.   All right. When did it break down?
18    A.   It broke down a bunch of times. But it
19 broke down, I think my second week.
20    Q.   Okay.
21    A.   I believe.
22    Q.   All right. So you're staying in a --
23 you're staying in a Holiday Inn. You're going to be

Page 174

1 there for weeks; right? Months, in fact. At that
2 time you believe you're going to be there for months;
3 right?
4   What is it that you take with you? Is
5 it just a suitcase and off you go?
6   A.   A suitcase. Cases of vegetables and
7 cans of stuff that most people don't want to eat.
8   Q.   I'm intrigued.
9   A.   And a dog.
10   Q.   Oh. What kind of dog?
11   A.   A little guy we found on the side of the
12 road left for dead, hit by a car, that we took in.
13   Q.   When did you take him in?
14   A.   It's probably been almost 11 years ago.
15   Q.   Okay. So what kind of dog was it?
16   A.   Mixed. He looks sort of like a fat --
17 not a dachshund. Corgi. Looks like sort of a chubby
18 corgi.
19   Q.   And you arranged to have a pet-friendly
20 hotel; right?
21   A.   Yes, sir.
22   Q.   You made that point.
23     And so when you got to the hotel, you

Page 175

1 had one room?
2   A.   Yes.
3   Q.   By the way, did you take pictures of
4 your family with you?
5   A.   I probably had something in my wallet,
6 but --
7   Q.   You're not a -- you didn't take a framed
8 picture of your family?
9   A.   No, no.
10   Q.   No, you're not that sort? All right.
11     Okay. Well, what do you -- do you take
12 anything with you to the office or is it just a
13 sterile environment that you're sitting in, day after
14 day?
15   A.   No. They supplied -- I mean, everything
16 in the office I needed was supplied.
17   Q.   Okay. But you didn't bring any personal
18 effects with you to the office?
19   A.   I might have brought a book or so -- I
20 mean, a radiology book. But other than that, no.
21   Q.   Okay. All right. Now, when you
22 departed on April -- on May 20. Excuse me.
23     When you departed on May 20, did you

Page 176

1 take the book with you? Did you take something else
2 with you?
3   A.   Actually, I'm missing a Paul and Juhl
4 radiology textbook. I don't know if I left it there
5 or not. I don't know where I left it.
6   Q.   Okay.
7   A.   I know I'm missing it, but I don't know
8 if it was there or I left it somewhere else.
9   Q.   All right. Something happened between
10 you and the staff at the hotel; right?
11   A.   Yes, sir.
12   Q.   Okay. By the way, who arranged for you
13 to stay at that hotel?
14   A.   The hospital, I think. I assume it was
15 Medicus, but I mean -- not Medicus paid for it, I
16 assume, but I assume -- I think the hospital.
17   Q.   The hospital had a relationship with the
18 hotel. You're aware of that; right?
19   A.   I think the woman -- I think someone in
20 the hospital knew someone at the hotel to allow me to
21 take the dog, I believe.
22   Q.   Okay. I'm going to show you a couple of
23 statements, handwritten statements from the hotel

Page 177

1 employees, a few different hotel employees. Again, I
2 want you to take your time looking at those.
3     MR. McGRATH: We'll mark those as the
4   next exhibits, and we'll start with the shorter
5   of the two.
6     (Galuten Exhibit 8 is marked for
7     identification.)
8   Q.   Tell me when you've --
9   A.   I've finished.
10   Q.   We've marked that as Exhibit 8.
11     Were you aware that Kristie from the
12 hotel had prepared this statement?
13   A.   No, sir.
14   Q.   This is the first time you've seen it;
15 right?
16   A.   Yes, sir.
17   Q.   Okay. You stayed in Room No. 112?
18   A.   Oh, I don't remember the number.
19   Q.   That's what she indicates there; right?
20   A.   It says 112.
21   Q.   Yeah. Now, she talks about you
22 informing her of a confrontation between you and her
23 coworker, Thomas Lynn. Do you see that?

178

1     A.   I do.
2     Q.   It says here you regarded Mr. Lynn as
3 becoming more feminine. Do you remember suggesting
4 that to her?
5     A.   I don't remember suggesting that to her.
6 I do remember that happening.
7     Q.   What was happening exactly?
8     A.   I asked the gentleman that worked in the
9 evening -- my car had broken down and I asked him if
10 he could possibly giving me a ride to the hospital.
11 And he got very upset that I would ask him; that he
12 couldn't do such; and then he started telling me --
13 he got more and more anxious and he started telling
14 me, "Aren't you that doctor with the dog?"
15        "Yes."
16        And he told me that, "Well, if you're a
17 doctor, you should have a nicer car."
18        And then he said he would not be giving
19 me a ride but I had to get a cab. And he went behind
20 the whatever -- desk -- and got a phone book and
21 threw it towards me, to call a cab. And I called a
22 cab.
23     Q.   Okay. Do you remember anything else

179

1 about that exchange that you haven't told me?
2     A.   I remember I asked him to speak to -- if
3 I could speak to the manager about somehow arranging
4 for a ride.
5     Q.   Okay. Anything else?
6     A.   I do not remember anything else.
7     Q.   So now I'm going to go back to the
8 question that I asked that I don't think you've
9 answered yet.
10        What is it about what you just described
11 that demonstrated that he was becoming more feminine
12 during your argument?
13     A.   I'm sorry. Say again? What is it that
14 I demonstrated?
15     Q.   What is it that he did --
16     A.   Oh.
17     Q.   -- that demonstrated that he was
18 becoming more feminine?
19     A.   The way he talked. He became -- his
20 voice became more effeminate as he was getting more
21 anxious.
22     Q.   Okay. And do you think it's possible
23 that you pointed that out to Kristie?

180

1     A.   It's possible.
2     Q.   I mean, she says it here. Do you think
3 that she's lying about that?
4     A.   I don't -- I don't know that she's
5 lying.
6     Q.   I mean, you've just testified that you
7 actually thought at the time, hey, he's becoming
8 more feminine. She says that you mentioned it to
9 her. It makes sense that you probably did in fact
10 mention it to her; right?
11     A.   It's possible.
12     Q.   Why would you mention something like
13 that to her?
14     A.   I thought it was rather odd the way his
15 whole behavior changed when he got upset.
16     Q.   She says here that you instructed her to
17 feed your dog. Did you do that?
18     A.   I might have asked her. Because the
19 people during the day will often walk the dog for me.
20     Q.   They walked your dog?
21     A.   They used to play with him.
22     Q.   Did you ask hotel employees to walk your
23 dog?

181

1     A.   No, sir. They used to -- in fact, I
2 think initially I think people asked me if it was
3 okay to play with him. I said, "Please." And if
4 you -- and I said, "I'm gone most of the day."
5        And they said, "Well, is it okay if we
6 walk him?"
7        And I said, "Sure." And I always said,
8 "Let me know -- "If he does something, I'll clean it
9 up. Just let me know where -- the approximate
10 location where it is. I'll pick it up."
11     Q.   Okay. And did you ask her to feed your
12 dog and walk your dog?
13     A.   If I came in -- it says here -- if it
14 was a day my car was broken, I couldn't come in
15 between or anything. It's possible I asked her that.
16 I don't remember that.
17     Q.   You see how she says that you instructed
18 her? You don't believe that's what happened?
19     A.   Oh, I might have asked. I don't believe
20 I would instruct her, no, sir.
21     Q.   Might you have done it in a way that
22 suggested to her that it was a demand you were
23 making?

**Page 182**

1  A.  I don't believe it should have been, no.
2  The people there were very nice to myself as well as
3  the dog.
4  Q.  Does it surprise you that she found the
5  exchange between the two of you to be disturbing?
6  A.  I don't remember the exchange. But
7  it's bothersome that she feels that way, yes.
8  Q.  Then she says that you asked how you
9  were going to return to the hotel without
10 transportation. Did you think it was their
11 responsibility to provide transportation for you?
12 A.  Well, I learned in the morning that they
13 couldn't -- they wouldn't -- they could not do such.
14 Q.  So why would you raise it with her?
15 A.  If they knew of any means of
16 transportation. I had to get back to the hotel. It
17 was about, I would guess, three-and-a-half-plus mile
18 walk.
19 Q.  I think -- are you -- were you
20 unfamiliar with the use of taxicabs?
21 A.  In that area, yes.
22 Q.  Well, earlier, you had been shown a
23 phone book. Did you use the phone book to try to

**Page 183**

1  find a cab?
2  A.  I did.
3  Q.  And were there any taxicabs?
4  A.  There were a couple of names.
5  Q.  Okay. Did you call them?
6  A.  I did call one.
7  Q.  Okay. And what did you learn?
8  A.  Well, I called more than one. And the
9  guy -- someone did pick me up.
10 Q.  Okay. So if you had used the phone book
11 to identify a cab service, why would you then, after
12 that, talk to Kristie about how are you going to find
13 transportation to get to the hospital?
14 A.  Well, I had to get a long-term solution.
15 I couldn't do this on a regular basis.
16 Q.  Why not?
17 A.  I'm sorry. Why not?
18 Q.  Why not?
19 A.  They didn't have a large volume of taxi
20 service that would be able to be there a certain time
21 or leave at a certain time, if you were being done.
22 I mean, the guy who picked me up came in a -- I
23 assume it was his Caravan or whatever from home, with

**Page 184**

1  his kid stuff. He was nice enough to pick me up.
2  Q.  Your testimony is that the cab companies
3  in the area could not pick you up?
4  A.  I did not know if they could.
5  Q.  Did you ask them?
6  A.  I -- I did not specifically ask them,
7  no.
8  Q.  Were you trying avoid the cost of a cab?
9  A.  It wasn't my cost.
10 Q.  Okay. Whose cost was it?
11 A.  I assume it would be Medicus' cost.
12 Q.  Because your car broke down?
13 A.  Yes, sir.
14 Q.  Did you seek to rent a car?
15 A.  Eventually, yes.
16 Q.  You were making $3,000 a day. Right,
17 sir?
18 A.  Yes, sir.
19 Q.  $450 an hour overtime; right?
20 A.  Correct.
21 Q.  You made $128,000 in three weeks;
22 correct?
23 A.  I don't know the exact number.

**Page 185**

1  Q.  Does that sound accurate?
2  A.  It's possible that's an accurate number,
3  but I don't know for certain.
4  Q.  You made $128,000 in three weeks, and
5  you were troubling hotel employees about how you were
6  going to get three to four miles to work, sir?
7  A.  I thought it would be too long for me to
8  walk in the morning, since I was there early.
9  Q.  Let's go to the next one.
10    MR. McGRATH:  Why don't we mark that as
11 the next exhibit.
12    (Galuten Exhibit 9 is marked for
13    identification.)
14 Q.  Take your time and read that one,
15 please.
16 A.  (Reviewing document)
17 Q.  You've had a chance to review that?
18 A.  Yes, sir.
19 Q.  Now, this is a statement from Tom Lynn.
20 Okay? This was the gentleman that you were referring
21 to; right?
22 A.  Okay.
23 Q.  That apparently was becoming effeminate

Page 186

1 as he spoke to you?
2    A.   **Okay.**
3         MR. HOWARD: I'm sorry. Does it
4 indicate on here that it's a Thomas Lynn?
5         MR. McGRATH: No, I'm deducing it from
6 the other exhibit. We'll find our way down to
7 the hotel maybe in the next month or so, and
8 we'll have to confirm whose writing it is.
9    Q.   Now, you see his account differs
10 dramatically from the account that you just gave;
11 right?
12    A.   **I see differences, yes, sir.**
13    Q.   You don't think those differences are
14 significant?
15    A.   **Yes, they are.**
16    Q.   Okay. Did you use derogatory language
17 as he suggests?
18    A.   **I do not remember that, no.**
19    Q.   You might have, but you don't recall?
20    A.   **I do not remember doing that at all.**
21    Q.   But you may have?
22    A.   **I don't remember doing such.**
23    Q.   It says that you continued to insult

Page 187

1 him. Do you remember that?
2    A.   **I do not remember continuing to insult**
3 **him.**
4    Q.   Do you remember insulting him at all?
5    A.   **I remember being rather annoyed when he**
6 **tried -- when he threw a book towards me.**
7    Q.   Did you tell him that you were going to
8 make it your mission to see that he was fired?
9    A.   **I do not remember saying that. I did**
10 **remember saying something -- I would be surprised**
11 **that they would let someone work that would treat the**
12 **customers this way.**
13    Q.   What way? Not driving you to work?
14    A.   **No. Throwing a book at them.**
15    Q.   I see.
16         Now, when he tossed the phone book
17 toward you, is it true that you told him that you
18 were going to have him arrested for assaulting you
19 with a phone book?
20    A.   **I don't remember that. I might have**
21 **thought of speaking to his supervisor, his manager**
22 **about that, though.**
23    Q.   Okay. So where he says, "He said he was

Page 188

1 going to have me arrested for assaulting me with a
2 phone book," that's just untrue?
3    A.   **I don't remember that. I don't know.**
4    Q.   But you're not going to say that it's
5 untrue?
6    A.   **I don't remember saying it.**
7    Q.   Okay. Do you remember calling 911?
8    A.   **Maybe for a ride.**
9    Q.   You would call 911 for a ride to work?
10    A.   **Well, it says here I called to try to**
11 **get the police to give me a ride.**
12    Q.   Right. And I'm asking you, sir, is that
13 something that you did?
14    A.   **I don't remember. But I could -- I**
15 **definitely needed to -- I wanted to get a ride, yes.**
16    Q.   Okay. So you may have called 911 to get
17 a ride?
18    A.   **It says here I did.**
19    Q.   And you might have done that; correct?
20    A.   **Possibly.**
21    Q.   All right. You don't find that
22 disturbing behavior, sir?
23    A.   **I find it disturbing I lost my temper.**

Page 189

1    Q.   What evidences in this statement, what
2 evidences the fact that you lost your temper?
3    A.   **The fact that it annoyed me this much.**
4 **His reaction annoyed me that much.**
5    Q.   So you're saying that his reaction
6 caused you to call 911?
7    A.   **Well, no. The combination. If I called**
8 **911, it would have been a combination of his throwing**
9 **the book towards me or at me, as well as my need for**
10a **ride .**
11    Q.   Okay. Did you tell -- did you then tell
12 him to shut up?
13    A.   **I don't remember that.**
14    Q.   You see there it says, "A guest in 114
15 said that they'd stay with him to see that he was
16 safe."
17         Did you understand he did not feel safe
18 in your presence? Did you understand that?
19    A.   **I understand that from reading this. I**
20did **not understand that then, no.**
21    Q.   At the time, no.
22         Looking back on that now, if you did in
23 fact tell him that you were going to have him